# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

BRODERICK BURTON                                   CIVIL ACTION

VERSUS                                             NO. 15-371

BURL CAIN, WARDEN                                  SECTION: "A"(1)


## SUPPLEMENTAL REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Broderick Burton, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  On August 17, 2009, he was convicted of armed robbery under Louisiana law.[1]  On March 22, 2010, he was found to be a second offender and was sentenced as such to a term of forty-nine and one-half years imprisonment without benefit of probation, parole, or suspension of sentence.[2]  After he was granted an out-of-time appeal,[3] the Louisiana Fourth

---

[1] State Rec., Vol. 2 of 3, transcript of August 17, 2009, p. 123; State Rec., Vol. 1 of 3, minute entry dated August 17, 2009.
[2] State Rec., Vol. 2 of 3, transcript of March 22, 2010.
[3] State Rec., Vol. 1 of 3, Order dated August 13, 2010.

Circuit Court of Appeal affirmed his conviction and sentence.[4]  The Louisiana Supreme Court then denied his related writ application on October 12, 2012.[5]

On or about February 25, 2014, petitioner filed an application for post-conviction relief with the state district court.[6]  That application was denied on February 26, 2014,[7] and the Louisiana Fourth Circuit Court of Appeal likewise denied his related writ application on May 15, 2014.[8]  He did not seek review by the Louisiana Supreme Court.[9]

On February 5, 2015, petitioner filed the instant federal application seeking habeas corpus relief.[10]  The state filed a response arguing that the application should be dismissed as untimely.[11]  The undersigned agreed and issued a reporting recommending that the application be dismissed on that basis, finding that petitioner was not entitled to statutory tolling and had not established that he was eligible for equitable tolling or that "actual innocence" exception applied.[12]

With respect to "actual innocence" exception, the undersigned noted that the United States Supreme Court has stated:

> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar … or, as in this case, expiration of the statute of limitations.  We caution, however, that tenable actual-innocence gateway pleas are rare:  "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, **in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt**."

---

[4] State v. Burton, No. 2011-KA-1000, 2012 WL 4758381 (La. App. 4th Cir. Apr. 11, 2012); State Rec., Vol. 2 of 3.
[5] State ex rel. Burton v. State, 99 So.3d 42 (La. 2012); State Rec., Vol. 2 of 3.
[6] State Rec., Vol. 3 of 3; see also State Rec., Vol. 1 of 3, Docket Master entry for February 25, 2014; Rec. Doc. 1, p. 3, Answer to Question 11(a)(3); Rec. Doc. 1-1, p. 1.
[7] State Rec., Vol. 3 of 3, Judgment dated February 26, 2014.
[8] State v. Burton, No. 2014-K-0357 (La. App. 4th Cir. May 15, 2014); State Rec., Vol. 3 of 3.
[9] Rec. Doc. 1-1, p.1.
[10] Rec. Doc. 1.
[11] Rec. Doc. 9.
[12] Rec. Doc. 14.

McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013) (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)) (emphasis added).  The undersigned then found that petitioner had not invoked McQuiggin and, in any event, he had not made even a colorable showing that he is actually innocent in light of "new evidence."

Although petitioner did not file an objection to the Report and Recommendation, the United States District Judge stated that he was "not persuaded" that "actual innocence" did not apply under the facts of this case.  Accordingly, he rejected the Report and Recommendation and remanded this matter for the undersigned "to consider the merits of Burton's petition."[13]  Therefore, this Supplemental Report and Recommendation now addresses those claims.

## Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

> On December 28, 2007, at approximately 6:30 p.m., Claude Pelican was robbed at gunpoint.  Mr. Pelican lived and worked at the Grace Outreach House, a Banks Street facility in New Orleans for drug addicts and people with mental disorders.  About a week before he was robbed, Mr. Pelican cashed his paycheck.  As he did not have a bank account at that time, Mr. Pelican kept his money in cash in his wallet.
>
> On the day of the robbery, Mr. Pelican walked to a nearby corner store at Banks and Broad streets to pick up some household items.  He had $560.00 cash in his wallet.  While standing in line to check out, Mr. Pelican noticed that there was a man talking loudly behind him.  Mr. Pelican testified that he fumbled with his wallet when he tried to remove a twenty dollar bill to pay for his groceries.  He had to pull out all of the money to remove the bill he needed.  He demonstrated for the jury how close the loud-talking man was to him during this transaction.
>
> Mr. Pelican put the change from the transaction (about $14) into his pants pocket, leaving $540 in his wallet, and proceeded to walk home.  He had walked about a block down Banks Street toward S. Galvez Street, when he heard footsteps behind him.  He turned around and saw a man approaching.  The man demanded Mr. Pelican's wallet.  After some resistance on Mr. Pelican's part, the man produced a gun and put it in Mr. Pelican's face.  Mr. Pelican demonstrated for the jury how close he was to the gunman and how the gunman held the gun.  Mr. Pelican threw his wallet on the ground as instructed.  He walked away from the

---

[13] Rec. Doc. 17.

gunman, again as instructed.  When he turned the corner at S. Rocheblave Street, he called 911.

The 911 call was published to the jury.  Mr. Pelican told the operator that he had just been robbed.  He described the robber as a black male wearing a white shirt with long sleeves, dark pants, a knitted cap, and about 5′8″ in height, or a little bit taller than Mr. Pelican, who is about 5′7″.  He told the operator that the robber was heading toward Banks and Broad streets.

The 911 operator relayed this description over the NOPD radio.  First District Officers Durning and Rowley heard the dispatch.  They were driving on Banks Street when they saw two black males come from 2909-2907 Banks Street and jump into a white vehicle.  One of these two men matched the description of the armed robber.  The officers looped around to get behind the white vehicle, which had sped off.  They stopped the vehicle at Banks and Rendon streets, ordered the men out of the car, handcuffed them, and advised them of their rights per <u>Miranda</u>.

Sergeant Mitchell brought Mr. Pelican to Banks and S. Rendon streets for a show-up identification.  Mr. Pelican positively identified defendant Burton as the man who robbed him at gunpoint.  While he noted that the defendant was wearing a different shirt than he had worn during the robbery, Mr. Pelican had no trouble recognizing the defendant as the robber.  He particularly remembered the robber's facial hair, which was "well-groomed" with straight lines.

Mr. Pelican also identified the other apprehended man, Chris Taylor, as the loud-talker who had been behind him in line at the store.  Officer Rowley testified that the defendant and Mr. Taylor lived at the time on either side of the same shotgun double on Banks Street, the same residence from which Officers Rowley and Durning saw the two men walk toward the white vehicle.  Defendant lived at 2907 Banks Street, and his co-defendant, Chris Taylor, lived at 2909 Banks Street.

After Mr. Pelican positively identified the defendant on site, the defendant was searched.  Officer Rowley removed $540 from the defendant, five $100 bills and two $20 bills -- the exact denominations that were taken from Mr. Pelican in the armed robbery.  That money was photographed for evidence and returned to Mr. Pelican.

The defendant stated that he had no guns at home and his house was not searched.  Mr. Taylor told Lieutenant Meisch that he did have guns at home.  Lt. Meisch then went to Mr. Taylor's side of the double and secured a written consent to search form from Mr. Taylor's mother, the lessee.  A black handgun was recovered from under Mr. Taylor's mattress.  Mr. Pelican positively identified that gun as the one used in the robbery.  In court, Mr. Pelican stated that he recognized the gun on site because it had a red dot on its side, and he again identified the gun.

In court, Mr. Pelican identified a photograph of the defendant from the day of the robbery, taken when the defendant was booked.  Mr. Pelican also identified the defendant in open court as the man who robbed him, saying that he had "**no doubt**" that that was the man.[14]

---

[14] <u>State v. Burton</u>, No. 2011-KA-1000, 2012 WL 4758381, at *1-2 (La. 4th Cir. Apr. 11, 2012) (emphasis added); State Rec., Vol. 2 of 3.

**<u>Petitioner's Claims</u>**

Before turning to the merits of petitioner's claims, the Court must address the state's other procedural defenses.  In this federal application, petitioner asserts two claims: (1) he received ineffective assistance of counsel and (2) there was insufficient evidence to support his habitual offender adjudication. The state argues that petitioner failed to exhaust his state court remedies with respect to those two claims and, as a result, the claims are procedurally barred from review in this federal court.

The undersigned did not reach the exhaustion issue in the original report in light of the recommendation that the petition be dismissed as untimely.  However, petitioner's claims are in fact unexhausted.  "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  <u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004) (quotation marks omitted).  The United States Supreme Court has explained:

> The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings.  Under our federal system, the federal and state courts are equally bound to guard and protect rights secured by the Constitution.  Because it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation, federal courts apply the doctrine of comity, which teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.

<u>Rose v. Lundy</u>, 455 U.S. 509, 518 (1982) (citations, footnote, quotation marks, and brackets omitted).

"To exhaust, a petitioner must have fairly presented the substance of his claim to the state courts."  <u>Wilder v. Cockrell</u>, 274 F.3d 255, 259 (5th Cir. 2001) (quotation marks omitted).  That requirement applies to all levels of review in the state court system, meaning that a petitioner's

federal claim must have been fairly presented to "each appropriate state court *(including a state supreme court with powers of discretionary review).*"  Baldwin, 541 U.S. at 29 (emphasis added).

Here, it is beyond cavil that petitioner never presented the instant claims to the Louisiana Supreme Court.  Petitioner's only writ application filed with that court was the one he filed on *direct* review.  In that application, which was docketed as Case Number 2012-KH-1278 and is contained in Volume 3 of the state court record, petitioner raised only three claims:  (1) the trial court erred in denying his post-verdict judgment of acquittal; (2) there was insufficient evidence to support petitioner's conviction; and (3) petitioner's sentence was excessive.   Therefore, obviously, his instant claims were not exhausted on direct review.

While it is true that petitioner did assert the claims on *collateral* review, he did not pursue collateral review beyond the Louisiana Fourth Circuit Court of Appeal.  After the Court of Appeal denied relief, he did not seek review of his claims by filing a related writ application with the Louisiana Supreme Court; therefore, the instant claims are clearly unexhausted.  See, e.g., Miller v. LeBlanc, Civ. Action No. 12-2806, 2014 WL 1154271, at *13 (E.D. La. Mar. 21, 2014) (claims which are abandoned before review is sought by the Louisiana Supreme Court are unexhausted).

Further, it is also clear that a federal habeas claim is procedurally defaulted if the "prisoner fail[ed] to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."  Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997) (internal quotation marks omitted).  Here, there is little doubt the state courts would deny any new attempt by petitioner to assert the instant claims as procedurally barred, because any new application would now be both repetitive under La. Code Crim. P. 930.4 and untimely under La. Code Crim. P. art. 930.8.

Because the claims are defaulted, federal review is barred unless petitioner demonstrates either (1) the existence of "cause" and "prejudice" or (2) that a failure to address the claims will result in a "fundamental miscarriage of justice."  See, e.g., Bagwell v. Dretke, 372 F.3d 748, 756-57 (5th Cir. 2004). The latter exception turns on whether the petitioner has made "a persuasive showing that he is actually innocent of the charges against him.  Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted."  Finley v. Johnson, 243 F.3d 215, 220 (5th Cir. 2001) (citations omitted).

As noted, in the original Report and Recommendation, the undersigned concluded that petitioner has made *no* showing of "actual innocence";[15] however, the United States District Judge found otherwise.[16]  Because the same "actual innocence" analysis applies regardless of whether the exception is being invoked to overcome a limitations problem or a procedural bar, the undersigned must therefore assume that the District Judge would again reach the same conclusion in this context.  Accordingly, for the purposes of this decision, the undersigned must therefore assume that imposition of the procedural bar would result in a "fundamental miscarriage of justice," and so petitioner's claims must be considered on the merits.[17]

---

[15] Rec. Doc. 14.

[16] Rec. Doc. 17.

[17] In so doing, the undersigned makes one additional observation out of an abundance of caution.  Petitioner's second claim concerns a purported sentencing error, and it is unclear whether the "actual innocence" exception even applies to a defaulted claim of a sentencing error in a noncapital proceeding.

In Haley v. Cockrell, 306 F.3d 257 (5th Cir. 2002), the United States Fifth Circuit Court of Appeals, after noting that a split exists among the circuits on that issue, held that the "actual innocence" exception is available to petitioners in noncapital proceedings who claim they were erroneously sentenced.  Id. at 265-66.  The Haley court further held that, when barred claims dealt with such alleged sentencing errors, the "actual innocence" requirement is met only when the petitioner shows that "he would have not been legally eligible for the sentence he received."  Id. at 264.  However, the Supreme Court subsequently vacated the Haley decision on other grounds and remanded the case to the Fifth Circuit.  Dretke v. Haley, 541 U.S. 386 (2004).  In so doing, the Supreme Court expressly declined to answer the question of whether the "actual innocence" exception applies to noncapital sentencing errors.  Id. at 393-94.

The undersigned does not attempt to answer the question left open by the Supreme Court.  Nevertheless, in light of the District Judge's findings and his directive that the merits of petitioner's claims be addressed, the undersigned will assume for the purposes of this decision that the exception applies and has been met.

**<u>Ineffective Assistance of Counsel</u>**

As noted, petitioner first claims that he received ineffective assistance of counsel. The United States Supreme Court established a two-prong test for evaluating such claims. Specifically, a petitioner seeking relief must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced his defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984). The petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." <u>Jernigan v. Collins</u>, 980 F.2d 292, 296 (5th Cir. 1993); <u>see also</u> <u>Clark v. Johnson</u>, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. <u>Strickland</u>, 466 U.S. at 697.

To prevail on the deficiency prong of the <u>Strickland</u> test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. <u>See</u> <u>Styron v. Johnson</u>, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." <u>Little v. Johnson</u>, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. <u>See</u> <u>Strickland</u>, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993) (quoting <u>Strickland</u>, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. <u>See</u> <u>Crockett v. McCotter</u>, 796 F.2d 787, 791 (5th Cir. 1986); <u>Mattheson v. King</u>, 751 F.2d 1432, 1441 (5th Cir. 1985).

8

To prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.

When petitioner asserted his ineffective assistance of counsel claim in the state post-conviction proceeding, the state district court denied the claim on the merits, holding:

> In his application, Mr. Burton complains that his attorney was ineffective for not doing a better job challenging the identification and other evidence adduced at the trial.  This Court recalls the trial performance of defense counsel and strongly disagrees with that characterization.  Counsel did an admirable job in the face of overwhelming evidence of his client's guilt ….  Mr. Burton was caught within minutes of the robbery, a short distance away, matching the description given by the victim and in possession of the exact amount of money reported stolen by the victim.  This extremely strong circumstantial evidence was buttressed by the victim's confident identification and the handgun retrieved from the co-defendant's bedroom.  Again, this Court does not concur with the allegations that counsel was ineffective and this claim is without merit.[18]

The Louisiana Fourth Circuit Court of Appeal found "no error" in that ruling,[19] and, as noted, petitioner did not seek review by the Louisiana Supreme Court.

Before turning to petitioner's specific allegations concerning his attorney's performance, the undersigned notes one truism concerning such claims:  "If the facts adduced at trial point so overwhelmingly to the defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, then the defendant's ineffective assistance claim must fail."  Green v. Lynaugh, 868 F.2d 176, 177 (5th Cir. 1989).  That is the situation here.  As the state district court judge noted, and as the record amply supports, the evidence of plaintiff's guilt was overwhelming:  Petitioner and his co-defendant, who were neighbors living in separate sides of a double house, were apprehended within minutes of the robbery and petitioner was in possession

---

[18] State Rec., Vol. 3 of 3, Judgment dated February 26, 2014.
[19] State v. Burton, No. 2014-K-0357 (La. App. 4th Cir. May 15, 2014); State Rec., Vol. 3 of 3.

of the exact amount of money – in the exact denominations (five $100 bills and two $20 bills)[20] – stolen from the victim.  Prior to trial, the victim positively identified the co-defendant as the man who had observed him with the money at the store and identified petitioner as the robber.[21]  At trial, the victim again positively identified petitioner, testifying that there was "[n]o doubt" in his mind that petitioner was the man who robbed him.[22]  The victim also positively identified a gun recovered from the co-defendant's residence as the gun used in the robbery.[23]  Under these facts, it would seem that even the most skillful defense counsel could not have avoided a guilty verdict, and, therefore, that petitioner's claim should necessarily fail on that basis alone.  However, in light of the United States District Judge's finding that petitioner has made a persuasive showing of "actual innocence," the undersigned will further address petitioner's claims solely out of an abundance of caution.

Petitioner first argues that his counsel made "a very weak argument about the victim's identification of petitioner at the hearing on pretrial motions and also during trial."[24]  That is simply untrue.  The transcripts of the pretrial hearing and the trial[25] reflect that defense counsel made the best argument he could in light of the adverse facts.  The bottom line is that the circumstances of this case negate any argument that the identification was unreliable.  As the Louisiana Fourth Circuit Court of Appeal noted on direct appeal:

> The standard for determining the reliability of an identification, or the substantial likelihood of misidentification, is the five-factor test enunciated in Manson v. Brathwaite, 432 U.S. 98, 114-115, 97 S.Ct. 2243, 2253 (1977):  1) the opportunity of the witness to view the perpetrator at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of his or her prior description of the perpetrator; 4) the level of certainty demonstrated at the confrontation; and 5) the length of time

---

[20] State Rec., Vol. 2 of 3, trial transcript, p. 83.
[21] Id. at pp. 80-81.
[22] Id. at 86-87.
[23] Id. at p. 83.
[24] Rec. Doc. 1-1, p. 6.
[25] The transcripts are contained in Volume 2 of the state court record.

between the crime and the confrontation.  State v. Jones, 02-1171, p. 14 (La.App. 4 Cir. 6/26/02), 822 So.2d 205, 213.  The focus of the Manson factors is on Mr. Pelican's visual identification of the perpetrator.  See State v. Summers, 10-0341, p. 8 (La.App. 4 Cir. 12/1/10), 52 So.3d 951, 956.

Applying the Manson factors to the facts in this case, the record supports the reliability of Mr. Pelican's identification of the defendant.  First, there is no indication that the defendant's face was covered during the robbery, or that the lighting was bad.  In fact, Mr. Pelican testified that he distinctly remembered the defendant to have well-shaved facial hair.  Mr. Pelican had ample opportunity to see the defendant during the armed robbery, as he testified that he initially tried to fight the defendant off, but stopped when he saw that the defendant had a gun.  He testified that the defendant waived the gun in his face, indicating they were in very close proximity to one another.  He gave a detailed description of the clothing the defendant was wearing and the gun he was holding.  Although Mr. Pelican approximated the defendant's height at five-feet eight, the defendant was not measured when he was booked.  Further, the jury observed the defendant and the witness and could determine the degree of discrepancy as to height.

Aside from any discrepancy surrounding the defendant's height, Mr. Pelican remained steadfast that the man he identified as the armed robber is the defendant.  He also remained confident that Mr. Taylor, the man who was with the defendant when he identified him, saw Mr. Pelican in the store minutes before the robbery took place, and specifically saw Mr. Pelican fumbling with his wallet, which had a large amount of cash in it.

Mr. Pelican identified the defendant as the armed robber within minutes of the armed robbery.  Mr. Pelican testified that Sgt. Mitchell met him at his residence on Banks Street approximately five minutes after the armed robbery occurred.  Shortly thereafter, Sgt. Mitchell took Mr. Pelican to where the defendant was, and Mr. Pelican was able to positively identify the defendant.  In addition, Mr. Pelican testified that he noticed immediately that the defendant had changed clothes since the robbery; the defendant was no longer wearing a knit cap, and had changed his shirt. [26]

Because there was simply no basis on which defense counsel could reasonably argue that the identification was unreliable, it cannot be said that defense counsel performed deficiently with respect to the identification issue or that prejudice resulted.

Petitioner next claims that his counsel was ineffective for failing "to challenge the validity of the one-on-one confrontation between the petitioner and the alleged victim."[27]  It is true that

---

[26] State v. Burton, No. 2011-KA-1000, 2012 WL 4758381, at *3-4 (La. App. 4th Cir. Apr. 11, 2012); State Rec., Vol. 2 of 3.
[27] Rec. Doc. 1-1, p. 6.

petitioner was initially identified in a "show-up" identification, and it is further true that "the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other grounds, Griffith v. Kentucky, 479 U.S. 314, 326 (1987). Nevertheless, the use of such a procedure is not impermissible *per se*, and "the admission of evidence of a showup without more does not violate due process." Neil v. Biggers, 409 U.S. 188, 198 (1972). Moreover, the test for determining whether a single person show-up identification is admissible is based on the "totality of the circumstances," id. at 198-99, and, for the reasons already explained, the circumstances here clearly negate any inference of misidentification. Accordingly, it is obvious that both Pelican's out-of-court and in-court identifications of petitioner were admissible. Therefore, petitioner cannot show that he was prejudiced by counsel's performance with respect to the admission of the identifications.

Petitioner next complains that his counsel was ineffective for failing to challenge the introduction of the gun into evidence. This claim clearly fails. The police were given consent to conduct the search during which the gun was found, the evidence was challenged and found to be admissible by the trial judge at the pretrial hearing,[28] and the victim positively identified the gun at trial as the one used by petitioner.[29] Because the gun was obviously relevant and admissible

---

[28] The trial judge denied the Motion to Suppress Evidence as to "both defendants," stating:

> I'm going to Deny the Motion to Suppress Evidence of the signed Consent to Search provided as S-1. Ms. Taylor, Mr. Taylor's mother, certified that she had the authority to provide permission for 2909 Banks Street to be searched.
> Mr. Taylor told the police Ms. Taylor, Danchelle Taylor, was his mother. She signed the permission to search. The weapon was seized from that location.
> I'm denying the Motion to Suppress Evidence.

State Rec., Vol. 2 of 3, transcript of May 22, 2009, pp. 33-34.
[29] Id. at p. 83.

evidence, there is no basis for concluding either that counsel performed deficiently in this respect or that prejudice resulted.

Petitioner also claims that his counsel was ineffective for failing to adequately cross-examine the state's witnesses at the pretrial hearing and at trial.   As an initial matter, the Court notes that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment." Ford v. Cockrell, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), aff'd, 135 Fed. App'x 769 (5th Cir. 2005); see also Lewis v. Cain, Civ. Action No. 09-2848, 2009 WL 3367055, at *8 (E.D. La. Oct. 16, 2009), aff'd, 444 Fed. App'x 835 (5th Cir. 2011); Williams v. Cain, Civ. Action Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *11 (E.D. La. May 7, 2009), aff'd, 359 Fed. App'x 462 (5th Cir. 2009); Parker v. Cain, 445 F. Supp. 2d 685, 710 (E.D. La. 2006).  Moreover, courts are not to second-guess counsel's decisions on such tactical matters through the distorting lens of hindsight; rather, they are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689.  It is irrelevant that another attorney might have made other choices or handled such issues differently.  As the Supreme Court noted:  "There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way."  Id.  In any event, petitioner has not identified any relevant questions that counsel failed to ask on cross-examination.   Nevertheless, the Court has reviewed the transcripts in their entirety and finds that counsel's cross-examination was not deficient and that petitioner was not prejudiced by counsel's performance.

Lastly, petitioner argues that his counsel was ineffective for failing to challenge the validity of his detention and arrest.  This claim warrants little consideration.  To the extent that petitioner

is arguing that the police had no cause to initially detain him, that argument has no merit.  Within minutes after the crime, the officers observed petitioner, who matched the general description of the perpetrator, within blocks of the crime scene – therefore, they were allowed to stop him.  See United States v. Hensley, 469 U.S. 221, 229 (1985) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion."); United States v. Greer, 939 F.2d 1076, 1092 (5th Cir. 1991) ("'Reasonable suspicion' has been defined as the accumulation of those articulable, objective facts and circumstances observed by the officer, coupled with the rational inferences which can be drawn from those facts and circumstances.  The level of objective manifestation needed here is only minimal." (footnote, citation, and quotation marks omitted)).  Additionally, shortly thereafter, petitioner was positively identified by the victim and found in possession of the exact amount of money (in the exact denominations) taken in the robbery – at which point, the officers obviously then also had probable cause to arrest him.  Accordingly, any challenge to the legality of petitioner's detention and arrest would have been patently meritless, and counsel is not ineffective for failing to pursue meritless challenges.  See Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

        For all of the foregoing reasons, petitioner has not demonstrated that he was denied his Sixth Amendment right to the effective assistance of counsel.  Accordingly, this claim has no merit and cannot serve as a legitimate basis for granting federal relief.

**Habitual Offender Adjudication**

Petitioner next argues that the state's evidence at the habitual offender hearing was insufficient to support the finding that he was a second offender.  That claim was likewise rejected on the merits by both the state district court[30] and the Louisiana Fourth Circuit Court of Appeal[31] in the state post-conviction proceedings.

The sufficiency of the state's evidence on habeas review is governed by the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), which requires the court to determine whether, after identifying the elements of the offense as defined by state substantive law and viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements to have been proven beyond a reasonable doubt. See Caddell v. Quarterman, No. Civ. A. H-06-0652, 2007 WL 655759, at *6 (S.D. Tex. 2007) (Jackson is the appropriate standard to evaluate sufficiency of evidence in a multiple offender proceeding); see also Warfield v. Warden, Louisiana State Penitentiary, Civ. Action No. 09-cv-0361, 2012 WL 3067604, at *2 (W.D. La. July 10, 2012), adopted, 2012 WL 3067602 (W.D. La. July 27, 2012).

Regarding the sufficiency of evidence required under state law to support a habitual offender adjudication, the Louisiana Supreme Court has held:

> To obtain a multiple offender conviction, the State is required to establish both the prior felony conviction and that the defendant is the same person convicted of that felony.  In attempting to do so, the State may present:  (1) testimony from witnesses; (2) expert opinion regarding the fingerprints of the defendant when compared with those in the prior record; (3) photographs in the duly authenticated record; or (4) evidence of identical drivers license number, sex, race and date of birth.

State v. Payton, 810 So.2d 1127, 1130 (La. 2002) (citations and quotation marks omitted).

---

[30] State Rec., Vol. 3 of 3, Judgment dated February 26, 2014.
[31] State v. Burton, No. 2014-K-0357 (La. App. 4th Cir. May 15, 2014); State Rec., Vol. 3 of 3.  As noted, petitioner did not seek review of this claim by the Louisiana Supreme Court.

Here, petitioner argues that the state failed to meet its burden of proof to establish that he was the same person convicted of the predicate offense.  Again, that is simply untrue.  At the habitual offender hearing, Officer Joseph Pollard was accepted by the court as an expert in the field of fingerprint examination and identification.  In connection with Pollard's testimony, the prosecution introduced Exhibit 1, a card with the known fingerprints of petitioner.  Pollard then testified that (1) the fingerprints on Exhibit 1 matched the fingerprints on Exhibit 2, the arrest register relating to the records for the conviction for the predicate conviction, and (2) the identifying the information on the arrest register (specifically, the petitioner's name, date of birth, and item number) matched the identifying information on the other certified records relating to the conviction.[32]

To the extent that petitioner is arguing that the proof of identity was insufficient because the only usable fingerprints from the prior conviction were the ones on the *arrest register* (Pollard testified that the poor quality of the fingerprints on the bill of information from the predicate conviction rendered them unsuitable for identification purposes), he is clearly wrong.  Louisiana courts have long held that identity can be proven by establishing that the defendant's fingerprints match those on an arrest register and then linking that arrest register to conviction records by matching identifying information.  For example, in State v. Williams, 788 So.2d 515 (La. App. 4th Cir. 2001), the court expressly rejected a contrary argument, stating:

> Appellate counsel argues that proof of identity may not be established through the use of fingerprints on an arrest register, despite numerous decisions to the contrary.  To prove a defendant is a habitual offender under La. R.S. 15:529.1, the State is required to establish the prior felony conviction and that the defendant is the same person convicted of that felony.  State v. Anderson, 99-1407, p. 6 (La.App. 4 Cir. 1/26/00), 753 So.2d 321, 325.  Proof of identity can be established through a number of ways, such as the testimony of witnesses to prior crimes, expert testimony matching the fingerprints of the accused with those in the record of the prior proceeding, or photographs contained in a duly authenticated record.

---

[32] The transcript of the habitual offender hearing is contained in Volume 2 of the state court record.

State v. Isaac, 98-0182, p. 7 (La.App. 4 Cir. 11/17/99), 762 So.2d 25, 28-29, writ denied, 00-0239 (La. 1/26/01), 781 So.2d 1255. *It is sufficient to match fingerprints on an arrest register to a defendant, and then match the arrest register to a bill of information and other documents evidencing conviction and sentence; this can done through a date of birth, social security number, bureau of identification number, case number, specifics and details of the offense charged, etc.*

Id. at 530 (footnote omitted; emphasis added); accord Payton, 810 So.2d at 1130-32.  Any contention that habitual offender status can be proven *only* by comparing the defendant's fingerprints to the fingerprints appearing on the *bill of information* from the prior conviction is simply wrong.  Payton, 810 So.2d at 1132; Williams, 788 So.2d at 530-31.

In summary, it is clear that the evidence, considered in the light most favorable to the prosecution, was sufficient to support petitioner's habitual offender adjudication.  Accordingly, this claim likewise has no merit.

### **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal habeas corpus petition filed by Broderick Burton be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[33]

---

[33] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

17

New Orleans, Louisiana, this sixth day of April, 2016.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**